UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
RANDALL REINMANN, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

vs.

TG THERAPEUTICS, INC. and MICHAEL S. WEISS,

      Defendants.
---------------------------------------------------------------x

Civil Action No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff Randall Reinmann ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by TG Therapeutics, Inc. ("TG" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of TG common stock between June 4, 2018 and September 25, 2018, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

3. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District.

4. In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

**PARTIES**

5. Plaintiff Randall Reinmann purchased TG common stock, as set forth in the accompanying certification, which is incorporated by referenced herein, and has been damaged thereby.

6. Defendant TG is a biopharmaceutical company engaged in the acquisition, development, and commercialization of treatments for cancer and autoimmune diseases in the United States. TG common stock traded in an efficient market on the NASDAQ throughout the Class Period under the ticker symbol "TGTX."

7. Defendant Michael S. Weiss ("Weiss") is and was, at all relevant times, the Executive Chairman, Chief Executive Officer and President of TG.

8. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about TG and its products. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TG common stock was a success as it: (i) deceived the investing public regarding TG's prospects and business; (ii) artificially inflated the price of TG common stock; and (iii) caused plaintiff and other members of the Class to purchase TG common stock at inflated prices.

**SUBSTANTIVE ALLEGATIONS**

**TG and the UNITY-CLL Trial**

9. Defendant TG is a developmental biopharmaceutical company focused on the acquisition, development and commercialization of novel treatments for B-cell malignancies and autoimmune diseases.

10. The Company is currently developing two therapies targeting hematologic malignancies. TG-1101 (ublituximab) is a glycoengineered monoclonal antibody that targets a

unique epitope on the CD20 antigen found on mature B-lymphocytes.  TG is also developing TGR1202 (umbralisib), an orally available PI3K delta inhibitor.

11. This case concerns TG's UNITY-CLL Trial, a randomized controlled Phase 3 trial under Special Protocol Assessment ("SPA") evaluating TG-1101 in combination with TGR-1202, the Company's development stage PI3K delta inhibitor, for patients with front line and previously treated Chronic Lymphocytic Leukemia ("CLL")

12. In September 2015, TG reached an agreement with the United States Food and Drug Administration ("FDA") regarding an SPA on the design, endpoints and statistical analysis approach of a Phase 3 clinical trial for the proprietary combination of TG-1101 plus TGR-1202, for the treatment of CLL.  The SPA provides agreement that the Phase 3 trial design adequately addresses objectives that, if met, would support the regulatory submission for drug approval of both TG-1101 and TGR-1202 in combination.

13. According to TG, the UNITY-CLL trial had two key objectives.  The first was to demonstrate contribution of each agent in the TG-1101 + TGR-1202 regimen (the combination sometimes referred to as "U2"), and second, to demonstrate superiority in Progression Free Survival ("PFS") over the standard of care to support the submission for full approval of the combination.

14. According to TG, the UNITY-CLL trial would randomize patients into four treatment arms: TG-1101 + TGR-1202, TG-1101 alone, TGR-1202 alone, and an active control arm of obinutuzumab (GAZYVA®) + chlorambucil.  Then, an early interim analysis would be conducted to assess the contribution of each single agent in the TG-1101 + TGR-1202 combination regimen, which, if successful, will allow early termination of both single agent arms.  According to TG, a second interim analysis will be conducted following full enrollment into the study, which, if positive, the Company planned to use for accelerated approval.

15.     In May 2017, TG announced that the independent Data Safety Monitoring Board ("DSMB") of the UNITY-CLL Phase 3 trial had successfully completed a pre-specified interim analysis to assess the contribution of TG-1101 and TGR-1202 in the combination regimen of TG-1101 plus TGR-1202.  According to the Company, the DSMB reviewed efficacy data from approximately 50 patients per arm in the UNITY-CLL study who were eligible for at least one response evaluation.  Based on the overall response rate data available, and in accordance with the statistical analysis plan in the study's SPA, the DSMB determined that contribution has been established and recommended that TG cease enrollment into the single agent arms.

16.     Thus, in May 2017, according to TG, the study began enrolling in a 1:1 ratio to only the two combination arms: the investigational arm of TG-1101 plus TGR-1202 and the control arm of obinutuzumab plus chlorambucil.  Additionally, according to TG, the DSMB reviewed safety data from all patients on study as of the data cut-off date and identified no safety concerns in any treatment group and recommended the continuation of the study without modification.

17.     In September 2017, TG announced that target enrollment in the UNITY-CLL trial was met and that it was extending enrollment until October 12, 2017 for any additional identified study patients to be allowed in the trial.  TG also announced that it expected to report top-line overall response rate ("ORR") data from this study to be reported in 2018.

**Materially False and Misleading Statements
Made During the Class Period**

18.     The Class Period starts on June 4, 2018.  The day before, on Sunday, June 3, 2018, TG presented at the annual meeting of the American Society of Clinical Oncology ("ASCO").  During the presentation, defendant Weiss was directly asked about the unblinding procedure for the data generated by the UNITY-CLL study.  The following exchange took place:

> [**Reni John Benjamin ("Benjamin") - Raymond James & Associates, Inc., Research Division - Senior Biotechnology Analyst**:]  And you'll love it because it's a UNITY-CLL question.
>
> [**Defendant Weiss:**]  Don't ask me how the patients are doing.
>
> [**Benjamin:**]  No. So can you talk a little about the unblinding procedure, the process, right, when you decide to – it's open to the public.  What happens, who knows the data, what is it that you know at the end of [Audio Gap] the 2 options that you. . . .
>
> [**Defendant Weiss**:]  Yes.  So as everyone, I think, knows, at least in this room, so it's a – it's got 2 parts of this trial: we have overall response and then there's progression-free survival.  So we do have to be cautious about the unblinding process.  It's not the end of the trial.  It's the end of the portion of the trial.  So the way it will work basically is there's an independent statistician that basically gets the data.  So we don't see anything.  They do their work and then they, basically read with the Data and Safety Monitoring Committee.  If it's positive, then we'll have access to the data.  If it's not positive, we don't get access to anything and the study goes on.  What they release to us, I think there's definitely going to be caution on how much data does get released.  I mean, clearly, we'll need enough data to be able to file.  So we'll get that much data – which, I guess, is a lot at some point.  But I think depending on the timing of when that's available to us is not fully vetted yet.

19.     On August 7, 2018, TG issued a press release announcing its second quarter financial results for the second quarter ended June 30, 2018 and providing a "[b]usiness [u]pdate." Defendant Weiss commented on the results and the business update, stating in pertinent part as follows:

> "We believe TG has never been better positioned for success and look forward to an impactful remainder of the year, and importantly the announcement of topline overall response rate date from UNITY-CLL Phase 3 trial before the end of the summer."

20.     That same day, TG held a conference call with analysts and investors to discuss the Company's earnings release and its business outlook. During the conference call, defendant Weiss spoke positively about the UNITY-CLL study stating in pertinent part as follows:

> First and foremost, let's talk about the UNITY-CLL Phase III program.  For those of you joining us for the first time, this is a Phase III trial comparing our U2 combination to an active control arm of obinutuzumab plus chlorambucil in patients with both treatment naïve as well as relapse or refractory chronic lymphocytic leukemia.  The trial is being conducted under Special Protocol Assessment with the FDA and is a large global trial, including over 600 patients. Enrollment into this trial exceeded our expectations and was completed ahead of schedule in October of 2017

and included approximately 60% frontline patients and 40% relapsed/refractory patients.

As previously guided, we are targeting top line overall response rate data from this trial by the end of the summer. To remind everyone, we are targeting a 15% absolute improvement in overall response rate. It is also worth reminding everyone that the primary endpoint to this study is progression-free survival, which is expected to support full approval of the U2 combination and ideally support a very broad label for the treatment of CLL.

During the conference call, an analyst asked defendant Weiss about the release of the UNITY-CLL data. The following exchange took place:

[**Yatin Suneja ("Suneja"), Director and Senior Research Analyst, SunTrust Robinson Humphrey, Inc., Research**:] Just a question on the time line. So UNITY-CLL data by the end of summer, could you, Mike, maybe tell us where we'll be in terms of the median or mean follow-up when you announced these data? What needs to happen between now and data release? And have you locked the database yet? And then I do have a follow-up after that.

[**Defendant Weiss**:] So – thanks for the question, Yatin, of course. So in terms of the median or mean follow-up when we open up, so I think I can give you the minimum follow-up. I don't think I can give you the median or mean follow-up. So I'm sure at this point, it's probably obvious to folks that we have decided to wait for the 12 cycles. So we'll have at least, basically, I guess, a minimum of 11 months because it's 48 weeks. It's 12 cycles of minimum of 48 weeks of follow up on all patients. The median is probably plus another 6 or 7 months, I don't know for sure, but approximately that probably get us to the median or the mean. What needs to happen now – between now and the release. I guess, in your next part of the question, have we locked the database yet. No, from, I think, when the database is locked to the actual data, it should only be a matter of a few days, I think, once that happens. So if the question was a trick question, you tricked me. Good work. So it's probably not in the next day or 2. But I think, yes, we're – the team – we have a big team, working hard, cleaning data, getting everything put together. Statisticians are making all their preparations and making sure we do this thing perfectly. And just – we know that the goal is to get some information out, but we also need to be mindful of the fact that there's the big PFS coming up behind this and we just need to be cautious. So again, the teams are working hard. The statisticians and our statistician consultants and our team of clinical ops folks are cleaning stuff. So I don't know what else you want to hear from me on this point, but everyone is working hard to get it done as quickly as they can.

[**Suneja:**] Okay. This is helpful. Then you mentioned the big PFS. I mean, obviously, there is an important – that is the primary endpoint. So help us understand the timing or when could we expect that endpoint. I mean, obviously,

you're going to use ORR as an accelerated approval endpoint.  So maybe also talk about the importance of PFS and, obviously, help us regard the timing?

[**Defendant Weiss**:]  Yes.  So the PFS is, again, a little bit more vague in terms of when it will occur.  We've said in the past that our best guess today is sort of slap a normal distribution curve over 2019, put maybe a little tail end to the end of '18 and a tail end to '20.  But that – as I said before, that's just a rough guess of what could happen.  I think our goal is toward the end of the year or maybe as we get into the ASH time frame or even maybe at JPMorgan, we'll have enough information on event rates to create a better profile of when we think that will occur.

21.     The statements referenced above in ¶¶18-20 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts which were known to defendants or recklessly disregarded by them as follows:

(a)     that TG was involved in cleaning the data collected in the UNITY-CLL study and, as a result, was able to gain an understanding as to the efficacy of the combination therapy;

(b)     that, as a result of that data cleaning, TG knew that the UNITY-CLL study had failed to meet its stated goal – a 15% increase in ORR and that, as a result, the Company would not be able to seek accelerated approval; and

(c)     that given that the UNITY-CLL had failed to meet its stated ORR goal it was highly unlikely that the combination therapy would meet its primary endpoint of increased PFS – in other words, the drug therapy had failed.

22.     From September 4, 2018 to September 24, 2018, the price of TG stock declined from $12.40 per share to $9.25 per share as investors reacted to TG's failure to release the UNITY-CLL study data by Labor Day, September, 3, 2018.

23.     Then, on September 25, 2018, TG announced that it wouldn't be releasing the data from the UNITY-CLL study and that it had failed to meet the ORR stated goal.  The Company issued a press release announcing that the DSMB met to review ongoing data from the UNITY-CLL study and advised the Company that the interim analysis of the ORR could not be conducted at this

time because the data was not sufficiently mature to conduct the analysis. Defendant Weiss commented on the announcement stating in pertinent part as follows:

> "While we are disappointed that we were not able to report positive ORR today, we feel that making the decision to focus on PFS, the primary endpoint for the study, is an important step to getting everyone aligned on the endpoint of this study that matters most to the Company . . . ."

24. That same day, TG held a conference call with analysts and investors to discuss the announcement about the UNITY-CLL study. Defendant Weiss provided the following mea culpa:

> As I'm sure you're aware, we announced earlier today that the Independent Data Safety Monitoring Board responsible for monitoring the UNITY-CLL study and conducting the interim Overall Response Rate analysis, notified the company that the interim analysis of overall response could not be conducted as they felt the data were not sufficiently mature. The DSMB did not provide us further color on the maturity but they do plan to meet quarterly going forward to review the ongoing progress of the study. For us, the decision by the DSMB to delay the analysis was quite disappointing, as we had already waited what we thought would have been a sufficient amount of follow-up time.
>
> In light of their decision, we had to really think hard and realistically about the future potential for an accelerated approval filing based on UNITY-CLL. Faced with uncertain timing as to when the data might mature and uncertain outcome in already challenging regulatory environment for accelerated approval in CLL, it seemed hard for us to continue to guide that we reasonably believed accelerated approval was a credible option. It seems it is the right time to focus on the study's primary endpoint of Progression Free Survival to support full approval of the U2 combination. We just felt that whether overall response is openly positive or not, the delays in getting to mature enough overall response data continue to narrow the gap between potential overall response filing and a PFS filing and thus, again, continued reliance on that endpoint for a rapid path to approval seem misguided.
>
> We feel that making the decision to put this behind us and focus on PFS, the primary endpoint for the study, is an important step to getting everyone aligned with the trial endpoint that matters most to the company and provides the most value to its long-term shareholders. We have always viewed overall response as a free upside option and possibly an early path to accelerate approval and have never viewed any negative or ambiguous overall response results to adversely affect our high-level of conviction in a successful PFS outcome. We have seen how other B-cell receptor antagonists have shown dramatic improvements in PFS in similarly designed studies, and we believe the umbralisib early clinical data supports our belief in a positive PFS outcome for U2. We're anxiously looking forward for the day we can present our PFS curves. As a reminder, the PFS readout is event-driven, and we believe we could potentially reach target events in 2019.

25.     During the conference call, defendant Weiss confirmed that TG employees were involved in cleaning the study data. The following exchange took place:

> [**Reni John Benjamin ("Benjamin") - Raymond James & Associates, Inc., Research Division - Senior Biotechnology Analyst**:] Can you talk a little bit about when the DSMB got this data? And I would've thought that maybe the database and the data was cleaned up and during that cleanup process, it would have become apparent that the data wasn't matured. So I'm just trying to understand, was that done by TG, a third party? And I guess, related to the DSMB, was there a futility analysis that was conducted by the DSMB since they couldn't conduct this ORR analysis?
>
> [**Defendant Weiss**:] Yes. So first part of your question, DSMB, they were – basically had the information over the weekend. So we didn't have a lot of time from their position to us to today. You had a few parts to that question, say. . . .
>
> [**Benjamin**:] Yes, I apologize. The database cleanup and – is that done by – or the cleanup of the data, is that done by TG or a third party? And then also was a futility analysis conducted by the DSMB?
>
> [**Defendant Weiss**:] Yes, yes. So the cleanup is done by both TG employees and by external vendors. So it's a collaborative effort to make sure that data is complete. And in terms of a futility analysis, the DSMB did not conduct a formal futility analysis at this meeting. They have access to all the PFS information. They have access to unblinded. They have, obviously, all the safety information. And they are empowered at any – at any point, if they feel that the benefit-risk ratio is not appropriate to end the study even outside of a formal futility analysis. So again – yes, we can only speculate that they didn't see anything in the safety database and the PFS profile that gave them pause that this study should be stopped for any benefit-risk issue.

26.     In response to the news that the UNITY-CLL study had failed to meet its ORR goal and that potential commercialization would be greatly delayed, the price of TG stock declined from $9.25 per share to $5.15 per share on extremely heavy trading volume.

### ADDITIONAL SCIENTER ALLEGATIONS

27.     As alleged herein, TG and defendant Weiss acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in

- 9 -

the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding TG, their control over, and/or receipt and/or modification of TG's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning TG, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

28.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of TG common stock and operated as a fraud or deceit on Class Period purchasers of TG common stock by misrepresenting the Company's business and prospects. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of TG common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of TG common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

29.     TG's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

30.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of TG who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated

to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

31. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased TG common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

32. The members of the Class are so numerous that joinder of all members is impracticable. TG stock was actively traded. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TG or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the 1934 Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of TG; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

37.     Plaintiff incorporates ¶¶1-36 herein by reference.

38.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of TG common stock during the Class Period.

40. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TG common stock. Plaintiff and the Class would not have purchased TG common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against All Defendants

41. Plaintiff incorporates ¶¶1-40 herein by reference.

42. Defendant Weiss acted as a controlling person of TG within the meaning of Section 20(a) of the 1934 Act. By reason of his positions with the Company, and his ownership of TG stock, defendant Weiss had the power and authority to cause TG to engage in the wrongful conduct complained of herein. Defendant Weiss controlled TG and all of its employees. TG controlled defendant Weiss. By reason of such conduct, all defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury

DATED: October 4, 2018                ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                      DAVID A. ROSENFELD


                                         /s/ *David A. Rosenfeld*
                                      DAVID A. ROSENFELD

                                      58 South Service Road, Suite 200
                                      Melville, NY  11747
                                      Telephone: 631/367-7100
                                      Fax: 631/367-1173
                                      Email: drosenfeld@rgrdlaw.com

                                      *Attorneys for Plaintiff*

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
Email: davew@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: 770/200-3104
770/200-3101 (fax)
Email: michaelf@johnsonfistel.com

*Attorneys for Plaintiff*

- 15 -

## CERTIFICATION OF PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Randall Reinmann, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint with my counsel and authorize its filing.

2. I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. I made the following transactions during the Class Period in the securities that are the subject of this action.

TG Therapeutics, Inc.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 9/10/18 | 555 | $11.3174 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
|  |  |  |

5. I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of October, 2018.

DocuSigned by:

*Randall Reinmann*

93573F63DCE84E6...

Randall Reinmann